UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| NANCY PAPAIOANNOU, Plaintiff, v. NEW YORK COMMUNITY BANCORP, INC., Defendant. | **OPINION AND ORDER** 24 CV 3383 (VB) |

Briccetti, J.:

Plaintiff Nancy Papaioannou brings this action against defendant New York Community Bancorp, Inc., alleging it discriminated against her based on age and sex, and retaliated against her for complaining about the discrimination, in violation of Title VII of the Civil Rights Act of 1964 ("Title VII"), 42 U.S.C. § 2000e, et seq.; the Age Discrimination in Employment Act ("ADEA"), 29 U.S.C. § 621, et seq.; and the New York City Human Rights Law, N.Y.C. Administrative Code § 8-107, et seq. ("NYCHRL").

Now pending is defendant's motion for summary judgment. (Doc. #30).

For the following reasons, the motion is GRANTED IN PART and DENIED IN PART.

The Court has subject matter jurisdiction pursuant to 28 U.S.C. §§ 1331, 1367.

## BACKGROUND

The parties have submitted briefs, statements of material fact pursuant to Local Civil Rule 56.1, and declarations with exhibits. These submissions reflect the following factual background.

I. Plaintiff's Employment with New York Community Bancorp, Inc.

In 1990, plaintiff emigrated from Greece to the United States and began working as a customer service representative for Atlantic Bank of New York ("Atlantic Bank" or "ABNY"). In 2006, New York Community Bancorp, Inc. ("NYCB"), acquired Atlantic Bank.

Plaintiff was periodically promoted over the course of her employment. In 2014, she was promoted to President of Atlantic Bank, a division of NYCB. In that role, plaintiff's primary job was to "represent the Bank to customers and the community with significant focus on Greek oriented clients." (Doc. #32 ("McCloskey Decl.") Ex. 7). In or about 2016, plaintiff received the additional corporate title of Managing Director. The promotion came with a pay raise and a stock award. As President of Atlantic Bank with a Managing Director title, plaintiff's job was to focus on serving the Atlantic Bank banking community and clients within her book of business. Plaintiff did not have the authority to make lending decisions or capital or investment decisions. For the relevant period, plaintiff had to discuss any strategic plans for Atlantic Bank with the President of NYCB, who was the final decision maker. Plaintiff reported to Andrew Kaplan, who was responsible for Retail Operations.

For the duration of plaintiff's tenure, Atlantic Bank was one of NYCB's eight divisional banks. Each divisional bank had its own brand, although NYCB was one legal entity. On December 31, 2020, NYCB announced that Thomas R. Cangemi would be promoted to President and CEO of NYCB. Cangemi had been working for NYCB since 2001. When Cangemi assumed the role of CEO, the NYCB Board of Directors decided to move away from the divisional structure and toward "one brand, one bank, one culture." (Doc. #33 ("Joint 56.1 Stmt.") ¶ 19). This transition meant the original business model, consisting of various divisional banks under different brands, would be consolidated into a single brand.

II. April 2021 Flagstar Merger

On April 26, 2021, Cangemi announced in a memorandum to all employees that NYCB was acquiring Flagstar Bancorp, Inc. ("Flagstar"), a then-leading regional bank. The Flagstar merger promised nearly to double NYCB's assets and triple the number of its employees.

On July 21, 2021, Cangemi circulated another memorandum detailing appointments to a "combined Senior Executive Leadership Team," all of whom were to report directly to Cangemi upon the closing of the transaction. (McCloskey Decl. Ex. 11). Plaintiff was not an appointee. Kaplan was promoted to a new position that would report directly to Cangemi after closing.

On April 27, 2022, a year after the initial Flagstar merger announcement, Cangemi sent another memorandum noting the merger was delayed due to regulatory approvals.

None of these three memoranda mentioned NYCB's planned abandonment of its divisional structure.

III. Elimination of the Atlantic Bank Advisory Board

When NYCB acquired Atlantic Bank in 2006, Atlantic Bank had an advisory board tasked with advising the President of Atlantic Bank. One of the terms of NYCB's acquisition was the continuation of the advisory board for a period of three years. NYCB negotiated a similar term with two previously acquired NYCB divisional banks.

In late 2020, the NYCB Board of Directors discontinued all divisional boards, including Atlantic Bank's advisory board.

In early 2021, Atlantic Bank's advisory board dissolved. Kaplan told plaintiff that NYCB dissolved the board because Cangemi did not see the need to continue with the divisional advisory board structure.

IV. Plaintiff's Complaints about her Diminishing Role

In or around March 2020, plaintiff was asked to move out of her office at Park Avenue and 54th Street in Manhattan while the building was renovated. Plaintiff was moved to an office across the street, which she complained was too small. Plaintiff was offered a larger office in Astoria, Queens, which she rejected so as to stay in Manhattan.

On several occasions between May 2021 and February 2022, plaintiff expressed concerns to Cangemi and Kaplan about her office space, the Flagstar merger, and her role in the post-merger entity.

A. Summer 2021 Complaints

On May 3, 2021, days after the initial merger announcement, plaintiff authored and emailed to Kaplan a "Commercial Transition Business Plan" that she deemed necessary for "a smooth transition." (McCloskey Decl. Ex. 12).

On May 27, 2021, plaintiff emailed Kaplan again, requesting a follow-up on her office space, which she said was "not appropriate for my position or my business," and her recommendations for the post-merger bank, which plaintiff understood Kaplan would discuss with Cangemi. (McCloskey Decl. Ex. 14). Kaplan responded minutes later: "Working on your items. We are working on integration workbooks for transaction and that is taking up many people's attention." (Id.).

On July 12, 2021, plaintiff emailed her Commercial Transition Business Plan to Cangemi. Cangemi responded, stating he would "take all of your thoughts into consideration!" (McCloskey Decl. Ex. 15).

On July 26, 2021, plaintiff emailed Cangemi again to "express some concerns about" her "continuously diminishing" role. (McCloskey Decl. Ex. 15).

On or about August 23, 2021, plaintiff met with Cangemi and Kaplan in person. Plaintiff prepared and brought an agenda which included, among other things: "1. Business Plan / Flagstar acquisition"; . . . "3. ABNY Exec Office primary office location"; and "4. ABNY President new role & responsibilities." (McCloskey Decl. Ex. 16). Cangemi stayed in the meeting for about fifteen minutes, during which he praised plaintiff's job performance. Defendant claims that during this meeting Cangemi also told plaintiff that NYCB was consolidating under a single brand and would no longer operate as a divisional structure with divisional bank brands. (Joint 56.1 Stmt. ¶ 50). Plaintiff claims she did not find out about the consolidation until October 2021. (Doc. #37 ("Papaioannou Decl.") ¶¶ 13, 15). Cangemi could not stay to discuss plaintiff's agenda, which plaintiff discussed only with Kaplan.

On September 7, 2021, plaintiff emailed Kaplan listing her "pending issues," which plaintiff understood Kaplan would "be undertaking the responsibility to fulfill . . . or solve." (McCloskey Decl. Ex. 17). The list included, among other things: "1. ABNY Exec Office primary office location"; "2. ABNY new role and responsibilities . . . . "; and "3. New reporting lines." (Id.).

B. Fall 2021 Meetings with Reggie Davis

In September 2021, Cangemi's secretary contacted plaintiff to set up a meeting between plaintiff and Flagstar's then-President of Banking, Reggie Davis. Davis was to become the President of Retail Banking in the post-merger entity, and all former divisional heads, including plaintiff, would report directly to Davis. Plaintiff again prepared an agenda, the last item of which was "ABNY President role and new responsibilities." (McCloskey Decl. Ex. 18).

During this meeting, Davis asked plaintiff to prepare a business plan for how she thought Flagstar and Atlantic Bank could operate together. In the plan, plaintiff stated her title should be

"Managing Director of 'Atlantic Bank Services Group,'" and she should report "directly to the President of Banking." (McCloskey Decl. Ex. 19). Her role would remain substantially the same, primarily focusing on "represent[ing] the Bank to the community an[d] clients with significant focus on Greek oriented clients locally and internationally." (Id.). Davis rejected this proposal as inconsistent with the dissolution of divisional banks and the formation of a single brand identity.

Plaintiff and Davis met again on or about October 20, 2021. Davis presented plaintiff with a proposal for an "Atlantic Commercial Banking Team," with plaintiff as the President. (McCloskey Decl. Ex. 20) (emphasis added). The proposal reiterated that the "use of the term Atlantic Bank as a separate division" was "inconsistent with the overall success of the [post-merger] bank." (Id.). Davis's proposal charged plaintiff "with business development across Consumer, Small Business, and Commercial within the Greek American Community," and included the formation of a four-person team to report directly to plaintiff, which plaintiff had requested in her original proposal. (McCloskey Decl. Exs. 19, 20).

Following the meeting, on October 21, 2021, plaintiff emailed Davis requesting "further clarification" after finding that Davis's proposal was "not comparable or of the same importance to my current job description and role." (McCloskey Decl. Ex. 21).

C. October 2021 Proposals to Kaplan

On October 24, 2021, plaintiff emailed Kaplan outlining her career accomplishments and proposing three options for her future at NYCB.

Option one was to "create a special funding 'Atlantic Group' a subsidiary to fit more or less my original business plan" which would include "Atlantic stand-alone LLC and myself in a Management leading position." (McCloskey Decl. Ex. 22). Option two was to make plaintiff an

"Advisor, Consultant, or Junior Member" of the post-merger executive board while maintaining plaintiff's titles and current job description. (Id.). Option three stated: "If anything than the two above options is acceptable, then as you suggested a Severance package." (Id.). By that, plaintiff clearly meant that if NYCB was not willing to adopt either of plaintiff's first two proposals, she would seek a severance package. Kaplan did not recall telling plaintiff she should seek severance if she did not like the options she was offered. (McCloskey Decl. Ex. 3 at 100).

On October 25, 2021, Kaplan replied he did not "see your first two options as being feasible," as it was "highly unlikely that the Bank would take on the taxes, accounting, and regulatory burden that would go along with forming a subsidiary/LLC dedicated to a market segment." (McCloskey Decl. Ex. 22). Kaplan's email contained a draft statement for plaintiff to issue to the Greek media to "send an appropriate message about your role and your Group's dedication to the Greek market." Kaplan further stated:

> I know that there are many current team members that are going to be challenged by changes that will occur after this sizable merger, but I think you will be in an excellent position. . . . The ability for you to remain in a prestigious position, deliver solutions, and be rewarded for success will place you in an enviable position.

Finally, Kaplan wrote: "As to option 3, I am not in a position to discuss. That [ ] would be a conversation to be held with our HR professionals." (Id.).

On October 27, 2021, plaintiff responded to Kaplan's email, writing, "I will definitely review again all my options and I'll take your writings into consideration." (McCloskey Decl. Ex. 22).

D. January 14, 2022, Complaint to Cangemi and February 24, 2022, Meeting

On January 14, 2022, plaintiff emailed Cangemi requesting another meeting to clarify and discuss plaintiff's role in the post-merger bank.

In the email, plaintiff recited the events which she says contributed to her "confusion" about her position, including: (i) when she complained to Kaplan about her inadequate office, he told her she was "emotional" and wanted an office for her "ego"; and (ii) when she felt "unprotected" by NYCB in the second meeting with Davis when she learned her position was being "eliminated" and her role within the new bank would be a "completely diminished position." (McCloskey Decl. Ex. 24). Plaintiff also cited her disappointment at not seeing her name on the "most recent corporate title designations announcement" as proof that NYCB "had no intentions from the start" of maintaining plaintiff's employment post-merger. (Id.).

Plaintiff concluded she was being discriminated against based on her sex, age, and national origin. (McCloskey Decl. Ex. 24) ("Based on my prior interactions with Mr. Kaplan and the way I have been treated, I cannot help but feel: I am not wanted because I am a woman; A foreign born woman; . . . My age is being seen as a hindrance"). Defendant denies Kaplan ever told plaintiff she was being emotional, but admits Kaplan told plaintiff she was viewing NYCB's decision to move forward under a single brand "through an ego perspective." (Joint 56.1 Stmt. ¶ 88).

On February 3, 2022, plaintiff requested to meet with Cangemi regarding her January 14, 2022, complaint.

On February 24, 2022, plaintiff met with Kaplan and NYCB Deputy Chief Human Resources Officer and Director of Employee Relations Mary Allen to address her concerns. Plaintiff recorded the meeting. Kaplan confirmed that while the merger was being finalized, plaintiff's job description would remain the same and, although plaintiff's job title was likely to change following the merger, her job description would remain post-merger as well. Kaplan emphasized he did not know when the merger would be finalized and when NYCB would make

the move away from the divisional structure. Kaplan reiterated NYCB was eliminating the divisional structure in its entirety, not just the Atlantic Bank division. Kaplan further encouraged plaintiff to relay to her clients the benefit of being a part of an "even bigger" bank that can "deliver even more resources" than Atlantic Bank. (McCloskey Decl. Ex. 26 at 50).

On March 1, 2022, Allen emailed plaintiff regarding plaintiff's January 14, 2022, "formal complaint with HR." (McCloskey Decl. Ex. 27). After reviewing plaintiff's complaint and the concerns raised, Allen concluded "there is no basis to suggest that the business decisions were made for anything but legitimate business purposes." (Id.). Allen encouraged plaintiff "to continue the dialogue with Andrew [Kaplan] related to how you can view the opportunities he mentioned created by the Flagstar merger to better serve the customer base that you support." (Id.).

E. March 7, 2022, Email

On March 7, 2022, in an email to plaintiff, Kaplan confirmed that, pursuant to their discussions, he was taking steps to relocate plaintiff's office to her preferred location, the Third Avenue branch of the Atlantic Bank division, but the logistics were not yet finalized. The record does not establish whether this relocation ever occurred.

Kaplan's email also confirmed: "There will be no material changes to the job description." (McCloskey Decl. Ex. 23).

F. Separation from NYCB

Six months later, on September 22, 2022, plaintiff sent Cangemi two separate emails. The first email, which plaintiff sent at 9:04 a.m. (the "9:04 a.m. email"), was a "follow up" to

plaintiff's January 14, 2022, complaint.[1] The 9:04 a.m. email reiterated plaintiff's discrimination allegations, expressed disappointment at Cangemi's failure to meet with plaintiff to discuss her concerns, and requested a "fair and equitable severance package." (McCloskey Decl. Ex. 28). In the second email, sent at 9:18 a.m. (the "9:18 a.m. email"), plaintiff requested the following separation package: (i) "4,500,000 in compensatory damages resulting from pervasive discriminatory behavior in the work environment which makes it unpleasant for me to continue"; (ii) "Severance equal to remaining on the payroll with full benefits through the date of my 66th birthdate"; (iii) "Life-time retirement pension and medical coverage upon reaching retirement age"; and (iv) "Pre-approval of any Bank communication aimed at the Greek Community regarding my departure." (McCloskey Decl. Ex. 29).

The 9:18 a.m. email further stated plaintiff was "prepared to take further action in this matter if it becomes necessary" and requested Cangemi's "decision" by October 10, 2022. (Id.).

On September 26, 2022, Eric Kracov, NYCB's Executive Vice President and Chief Human Resources Officer, and Allen met with plaintiff virtually to discuss the two emails. Plaintiff again recorded the meeting. Allen informed plaintiff that Cangemi reviewed her emails, would not engage regarding her terms, and would consider October 10, 2022, her separation date. Kracov reiterated plaintiff's demands were "well beyond the scope of anything that we would do" under the circumstances, and that although plaintiff would be paid through October 10, 2022, she should stop working immediately. (McCloskey Decl. Ex. 32 at 6–9). Kracov also told plaintiff she would receive additional information from Human Resources in the mail.

[1] The 9:04 a.m. email refers to a January 24, 2022, complaint. Because the Court is unaware of any complaint dated January 24, 2022, the Court presumes plaintiff intended to refer to the January 14, 2022, complaint.

On October 4, 2022, Kaitlyn Mauro, a Senior Benefits Specialist, sent plaintiff a letter congratulating plaintiff on her "retirement" and outlining her retirement benefits.

Plaintiff's employment with NYCB ended on October 10, 2022. At the time, she was sixty-one years old.

Following plaintiff's employment, Maria Kalamidas, a younger female, appeared in Atlantic Bank-related advertisements. Prior to plaintiff's separation from NYCB, Kalamidas was one of several managers of the Atlantic Bank branches. (McCloskey Decl. Ex. 1 at 79). Following plaintiff's separation, Kalamidas did not assume the role of President of Atlantic Bank. While Kalamida's official title is unclear from the record, the parties agree Kalamidas's role after plaintiff's departure was to manage the Greek-American banking relationships.

On April 19, 2023, plaintiff filed a complaint with the New York State Division of Human Rights ("DHR") alleging discrimination and retaliation on the basis of sex, age, and national origin in violation of the New York State Human Rights Law ("NYSHRL"), Title VII, and the ADEA. On December 21, 2023, the DHR issued a "Determination and Order After Investigation" concluding there was no probable cause to believe NYCB had engaged in the "unlawful discriminatory practice complained of." (McCloskey Decl. Ex. 34 at 1).

## DISCUSSION

I. Standard of Review

The Court must grant a motion for summary judgment if the pleadings, discovery materials before the Court, and any affidavits show there is no genuine issue as to any material

fact and it is clear the moving party is entitled to judgment as a matter of law. See Fed. R. Civ. P. 56(a); Celotex Corp. v. Catrett, 477 U.S. 317, 322 (1986).[2]

A fact is material when it "might affect the outcome of the suit under the governing law . . . . Factual disputes that are irrelevant or unnecessary" are not material and thus cannot preclude summary judgment. Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986).

A dispute about a material fact is genuine if there is sufficient evidence upon which a reasonable jury could return a verdict for the non-moving party. See Anderson v. Liberty Lobby, Inc., 477 U.S. at 248. The Court "is not to resolve disputed issues of fact but to assess whether there are any factual issues to be tried." Wilson v. Nw. Mut. Ins. Co., 625 F.3d 54, 60 (2d Cir. 2010). It is the moving party's burden to establish the absence of any genuine issue of material fact. See Zalaski v. City of Bridgeport Police Dep't, 613 F.3d 336, 340 (2d Cir. 2010).

If the non-moving party has failed to make a sufficient showing on an essential element of her case on which she has the burden of proof, then summary judgment is appropriate. Celotex Corp. v. Catrett, 477 U.S. at 323. If the non-moving party submits "merely colorable" evidence, summary judgment may be granted. Anderson v. Liberty Lobby, Inc., 477 U.S. at 249–50. The non-moving party "must do more than simply show that there is some metaphysical doubt as to the material facts, and may not rely on conclusory allegations or unsubstantiated speculation." Brown v. Eli Lilly & Co., 654 F.3d 347, 358 (2d Cir. 2011). The mere existence of a scintilla of evidence in support of the non-moving party's position is likewise insufficient; there must be evidence on which the jury could reasonably find for her. See Dawson v. Cnty. of Westchester, 373 F.3d 265, 272 (2d Cir. 2004).

---

[2] Unless otherwise indicated, case quotations omit all internal citations, quotations, footnotes, and alterations.

On summary judgment, the Court construes the facts, resolves all ambiguities, and draws all permissible factual inferences in favor of the non-moving party. See Dallas Aerospace, Inc. v. CIS Air Corp., 352 F.3d 775, 780 (2d Cir. 2003). If there is any evidence from which a reasonable inference could be drawn in the non-movant's favor on the issue on which summary judgment is sought, summary judgment is improper. See Sec. Ins. Co. of Hartford v. Old Dominion Freight Line, Inc., 391 F.3d 77, 83 (2d Cir. 2004).

## II. Discrimination Claims

Defendant argues plaintiff's sex and age discrimination claims fail because plaintiff has not established a prima facie case of discrimination as a matter of law under the ADEA, Title VII, or the more lenient NYCHRL.

The Court agrees.

### A. Legal Standard

The analytical framework of McDonnell Douglas Corp. v. Green, 411 U.S. 792 (1973), applies to claims of sex discrimination under Title VII, age discrimination under the ADEA, and the NYCHRL. See Leibowitz v. Cornell Univ., 584 F.3d 487, 498 (2d Cir. 2009). Under that framework, plaintiff must first establish a prima facie case of discrimination. See id. If plaintiff establishes a prima facie case, the burden shifts to defendant to defeat a rebuttable presumption of discrimination by articulating a legitimate, non-discriminatory reason for the adverse action. See id. at 498–99. If defendant does so, the presumption of discrimination drops out, and the burden shifts to plaintiff to show defendant's reasons are pretext for unlawful discrimination. See St. Mary's Honor Ctr. v. Hicks, 509 U.S. 502, 510–11 (1993).

1. Title VII and the ADEA

To make out a prima facie case of sex discrimination under Title VII or age discrimination under the ADEA, plaintiff must establish the following four elements: (i) membership in a protected class; (ii) qualification for the position; (iii) an adverse employment action; and (iv) circumstances giving rise to an inference of discrimination. See Leibowitz v. Cornell Univ., 584 F.3d at 498.

2. New York City Human Rights Law ("NYCHRL")

Discrimination claims under the NYCHRL are analyzed "separately and independently from any federal and state law claims" and are construed more liberally in favor of plaintiffs. Mihalik v. Credit Agricole Cheuvreux N. Am., Inc., 715 F.3d 102, 109 (2d Cir. 2013). Conduct that may not be actionable under federal laws may be actionable under New York City standards. See id. To establish a prima facie case of discrimination under NYCHRL, the plaintiff does not need to demonstrate a materially adverse employment action. See id. at 114. Instead, plaintiff must "show differential treatment—that she is treated less well—because of a discriminatory intent." Id. at 110. Nonetheless, "the NYCHRL is not a general civility code, and where a plaintiff fails to demonstrate that the defendant's conduct was caused at least in part by discriminatory or retaliatory motive . . . plaintiff's claim must fail." Id.

B. Prima Facie Case

The dispute in this case hinges on the third and fourth elements of plaintiff's prima facie case—whether an adverse employment action occurred under circumstances giving rise to an inference of discriminatory intent.

1. Adverse Employment Action

Under Title VII and the ADEA, an adverse employment action "is more disruptive than a mere inconvenience or an alteration of job responsibilities" and can include "termination of employment, a demotion evidenced by a decrease in wage or salary, a less distinguished title, a material loss of benefits, significantly diminished material responsibilities, or other indices . . . unique to a particular situation." Leibowitz v. Cornell Univ., 584 F.3d at 499.

Plaintiff claims she suffered the following adverse employment actions: (i) the elimination of the Atlantic Bank Advisory Board; (ii) a diminished role and title; (iii) an unsuitable office; and (iv) termination. (Doc. #35 ("Pl. Opp.") at 10). Defendant asserts that none of the complained-of actions constitutes an adverse employment action under Title VII or the ADEA.

The Court agrees with plaintiff but only as to the final two challenged actions.

a. Elimination of the Atlantic Bank Advisory Board

Plaintiff claims she suffered an adverse employment action when NYCB dissolved the Atlantic Bank advisory board in 2021 "without any input from her or prior notice to her." (Pl. Opp. at 10). Plaintiff asserts the dissolution was one was of the ways she was "squeezed out" of her "traditional executive functions" because she was thereafter excluded from major decisions affecting Atlantic Bank and her role as President of Atlantic Bank. (Id.).

"Excluding an employee from meetings may constitute an adverse action only where the exclusion affects the terms and conditions of the Plaintiff's employment." Deng v. New York State Off. of Mental Health, 2018 WL 11176018, at *9 (S.D.N.Y. Feb. 28, 2018). "Changes in assignments or responsibilities that do not radically change the nature of work are not typically

adverse employment actions." Potash v. Fla. Union Free Sch. Dist., 972 F. Supp. 2d 557, 584 (S.D.N.Y. 2013).

Although the dissolution of a body formed to advise the president may affect the conditions of the president's employment, plaintiff fails to present any evidence that she was excluded from meetings she was entitled to attend or that her assignments or responsibilities radically changed as a result of the board's dissolution. On the contrary, plaintiff does not dispute that prior to the advisory board's dissolution, she did not participate in the strategic decision-making for NYCB. Nor does she dispute that her job description, salary, and benefits remained the same following the dissolution. See Smalls v. Allstate Ins. Co., 396 F. Supp. 2d 364, 371 (S.D.N.Y. 2005) (finding that plaintiff's longer commute was an inconvenience, but not an adverse employment action when plaintiff retained "the same position, the same responsibilities, and the same salary and benefits").

Plaintiff concludes, without identifying a single specific instance, that "meetings that she would normally have with other senior management were routinely canceled" following the dissolution of the board. (Pl. Opp. at 7–8). Absent any evidence of improper exclusion, however, plaintiff's claim that she was squeezed out of her "traditional executive functions" rests on little more than her subjective belief that she should have been involved in these conversations. See Beyer v. Cnty. of Nassau, 524 F.3d 160, 164 (2d Cir. 2008) ("We require a plaintiff to proffer objective indicia of material disadvantage; subjective, personal disappointment is not enough."); Fraser v. MTA Long Island Rail Rd., 295 F. Supp. 3d 230, 259 (E.D.N.Y. 2018) (holding exclusion from meetings is not an adverse employment action).

Accordingly, the elimination of Atlantic Bank's advisory board does not constitute an adverse employment action under Title VII or the ADEA.

b. Change in Role and Title

Plaintiff asserts that her anticipated title change from President of Atlantic Bank and Managing Director to President of the Atlantic Commercial Banking Team constituted an adverse employment action because her new title represented a "diminished position." (Pl. Opp. at 5). Defendant argues the title change was a "cosmetic adjustment," plaintiff was told her role was not being diminished, and the change was necessitated by a company-wide restructuring that affected all divisions of NYCB, not just Atlantic Bank. (Doc. #38 ("Def. Reply") at 5).

Again, plaintiff's conclusory statement that her new title represented a diminished role is insufficient to defeat defendant's undisputed evidence to the contrary. See Carey v. Crescenzi, 923 F.2d 18, 21 (2d Cir. 1991) ("Bald assertion[s], completely unsupported by evidence . . . did not present a sufficient disagreement to require submission to a jury"); Jean-Pierre v. Citizen Watch Co. of Am., Inc., 2019 WL 5887479, at *7 (S.D.N.Y. Nov. 12, 2019) (finding plaintiff's change in role and responsibilities was not an adverse employment action when plaintiff did no more than express dissatisfaction with the work assigned). Indeed, the record indicates Kaplan and Cangemi met and communicated with plaintiff on multiple occasions over the course of a year to assuage her concerns. They assured her that her job description would not change. They asked her to take advantage of the opportunities associated with being a part of a bigger and better-resourced bank. Further, because plaintiff's employment ended before NYCB eliminated the divisional structure, the Court cannot determine whether the proposed new title was, in reality, a diminished role.

Based on the record, no reasonable jury could find plaintiff's change in role and title incidental to the company-wide restructuring constituted an adverse employment action under Title VII or the ADEA.

c. Change in Office

Plaintiff asserts her job required her to host dignitaries within the Greek government and that she suffered an adverse employment action when she "was not given a proper office to function as her role required." (Pl. Opp. at 10). Plaintiff also asserts, and defendant does not deny, that plaintiff did not have an assigned office at the time of her separation from the bank in October 2022, more than two years after she was removed from her office on Park Avenue and 54th Street in March 2020, and more than six months after Kaplan suggested to plaintiff that arrangements were being made to move her to an office on Third Avenue in March 2022.

Drawing all permissible factual inferences in favor of the non-moving party, plaintiff has adduced sufficient evidence that defendant's failure to provide her with an office was "more disruptive than a mere inconvenience" and materially impacted her ability to execute her role. Leibowitz v. Cornell Univ., 584 F.3d at 499. Plaintiff claims she could not "properly welcome dignitaries of the Greek and Cypriot Governments who were clients of the Bank." (Pl. Opp. at 10). And plaintiff asked Kaplan where she was expected to host representatives from Greek public television who were interviewing plaintiff for a documentary. (McCloskey Decl. Ex. 14). A reasonable jury could find that the failure to provide plaintiff with a proper office space materially impacted her ability to execute her role.

Accordingly, defendant's failure to provide plaintiff with suitable office space constitutes an adverse employment action under Title VII and the ADEA.

d. End of Employment

Finally, plaintiff asserts her employment was terminated and that one "can't get much more adverse than that." (Pl. Opp. at 10). Termination is indisputably an adverse employment action. See Leibowitz v. Cornell Univ., 584 F.3d at 499. A voluntary resignation, by contrast, is

not an adverse employment action unless the employee was constructively discharged.[3] See Chanval Pellier v. British Airways, Plc., 2006 WL 132073, at *4 (E.D.N.Y. Jan. 17, 2006); Lopez v. SB Thomas, Inc., 831 F.2d 1184, 1188 (2d Cir. 1987). Defendant disputes plaintiff's characterization that she was terminated and argues instead that defendant reasonably interpreted plaintiff's two emails of September 22, 2022, as a voluntary resignation, which defendant accepted.

Plaintiff has proffered sufficient evidence that a reasonable jury could determine she was terminated. Neither of plaintiff's September 22, 2022, emails explicitly offer her resignation and there is no evidence of Cangemi's accepting such resignation—only defendant's assertion that he did. No version of the term "resign" appears in the transcript of the September 26, 2022, meeting. (McCloskey Decl. Ex. 32). What Allen says instead is plaintiff "did mention October 10th, so we'll consider that to be your separation date." (Id. at 6).

Accordingly, plaintiff has made a prima facie showing that she was terminated and thus suffered an adverse employment action.

2. Inference of Discrimination

The Court next addresses whether defendant's failure to provide plaintiff with a suitable office and plaintiff's termination occurred in circumstances giving rise to an inference of discrimination based on sex or age.

Defendant argues there is no inference of discrimination because there is no connection between plaintiff's sex or age and any of the alleged discriminatory acts.

The Court agrees.

---

[3] Because neither party raises the doctrine of constructive discharge, the Court will not do so here.

An inference of discrimination may be derived from a variety of circumstances, including "invidious comments about others in the employee's protected group; or the more favorable treatment of employees not in the protected group; or the sequence of events leading to the plaintiff's discharge." Leibowitz v. Cornell Univ., 584 F.3d at 502. "[C]onclusory and speculative allegations are insufficient at the summary judgment stage; rather, [p]laintiff must come forward with specific factual circumstances that suggest the adverse action was motivated, at least in part, by discriminatory animus." Deng v. New York State Off. of Mental Health, 2018 WL 11176018, at *10; see also Gross v. NBC, 232 F. Supp. 2d 58, 72 (S.D.N.Y. 2002) (granting summary judgment where "[t]he record [was] replete with [plaintiff's] conclusory statements and subjective feelings—not facts—in support of her claims that she was treated differently because of her gender").

a. Change in Office

The only evidence plaintiff adduces that her change in office was motivated by her sex or age is that, when plaintiff complained to Kaplan about her office, Kaplan told her she was "emotional" and wanted a larger office in Manhattan office for her "ego." (Joint 56.1 Stmt. ¶ 87).

To be sure, "remarks made by decisionmakers that could be viewed as reflecting a discriminatory animus" may give rise to an inference of discrimination. See Chertkova v. Conn. Gen. Life. Ins. Co., 92 F.3d 81, 91 (2d Cir. 1996); King v. Aramark Servs., Inc., 96 F.4th 546, 564 (2d Cir. 2024) ("Gender-based comments can serve as evidence that gender played an impermissible role in an adverse employment decision"); Dietrich v. City of New York, 2019 WL 2236585, at *5 (S.D.N.Y. May 16, 2019) (ageist comments or remarks can demonstrate circumstances giving rise to an inference of age discrimination). However, "rude and

derogatory" comments, absent any discriminatory connotation, are not enough to establish a discrimination claim. Bickerstaff v. Vassar Coll., 196 F.3d 435, 452 (2d Cir. 1999). Further, "stray remarks alone do not support a discrimination suit." Danzer v. Norden Sys., Inc., 151 F.3d 50, 56 (2d Cir. 1998); see also Oncale v. Sundowner Offshore Servs., Inc., 523 U.S. 75, 81 (1998) (holding that Title VII is not a "general civility code").

The Court fails to see how Kaplan's statement about plaintiff's ego—however it was formulated—reflects a discriminatory animus, as having an "ego" is neither stereotypically female nor stereotypically male nor is it an ageist remark. At most, Kaplan's comment "reflect[s] a clash of personalities more than [a] discriminatory animus towards plaintiff." LaBella v. N.Y.C. Admin. for Children's Servs., 2005 WL 2077192, at *20 (E.D.N.Y. Mar. 28, 2005).

By contrast, a reasonable juror could find that Kaplan's statement that plaintiff was "emotional" constitutes a sex-based comment. See Kulick v. Gordon Prop. Grp., LLC, 2025 WL 448333, at *7 (S.D.N.Y. Feb. 7, 2025) (holding at the motion to dismiss stage that a male defendant who referred to plaintiff and other female employees in plaintiff's presence as "daschund," "schmatta," "sweetheart," "honey," "and my little butterfly" gave rise to a plausible inference of gender discrimination); but cf. Weinstock v. Columbia Univ., 224 F.3d 33, 44–45 (2d Cir. 2000) (holding "nice" and "nurturing" are "simply not qualities that are stereotypically female"). The analysis thus turns on whether this comment can be characterized as a stray remark.

The Second Circuit looks to four factors to determine whether a statement suggests discriminatory bias or is merely a "stray remark": "(i) who made the remark (i.e., a decision-maker, a supervisor, or a low-level co-worker); (ii) when the remark was made in relation to the

employment decision at issue; (iii) the content of the remark (i.e., whether a reasonable juror could view the remark as discriminatory); and (iv) the context in which the remark was made (i.e., whether it was related to the decision-making process)." Kulick v. Gordon Prop. Grp., LLC, 2025 WL 448333, at *7 (quoting Henry v. Wyeth Pharms., Inc., 616 F.3d 134, 149 (2d Cir. 2010)).

Here, although Kaplan was plaintiff's direct supervisor at the time of the remark, and although the record indicates Kaplan had a degree of control over plaintiff's office location, the comment was not factored into the decision concerning plaintiff's office. The record is undisputed that plaintiff was asked to leave her original office due to construction in the building and complained, for various reasons, about each office she was offered thereafter. Her desired location was a division on Third Avenue, which, months after making the alleged statement, Kaplan told plaintiff he was working to secure. Although no reason is proffered for why this relocation never occurred, there is no evidence, short of speculation, that it was because of Kaplan's discriminatory animus.

Therefore, Kaplan's comment that plaintiff was "emotional" is properly characterized as a stray remark which does not give rise to an inference of sex or age discrimination under Title VII or the ADEA. And, for the reasons stated above, "even under the more solicitous NYCHRL standard . . . the record establishes that [age and sex] discrimination did not play a role" in defendant's decisions relating to plaintiff's office. Gittens-Bridges v. City of New York, 2022 WL 954462, at *16 (S.D.N.Y. Mar. 30, 2022), aff'd, 2023 WL 8825342 (2d Cir. Dec. 21, 2023).

b. End of Employment

Plaintiff adduces the following evidence that her termination was motivated by her sex or age: (i) Kaplan allegedly advised her to seek severance if she was not happy with her role; (ii)

her separation letter referenced "retirement"; and (iii) a younger woman took over some of plaintiff's responsibilities. Plaintiff also asserts defendant conducted a "sham investigation" into plaintiff's January 14, 2022, complaint, which she says is evidence of discriminatory intent. (Pl. Opp. at 10–11). Even when considered collectively, this evidence is insufficient to support an inference of discrimination under any of the relevant statutes.

First, assuming Kaplan told plaintiff she should seek severance if she was unhappy with her new role, which he denies, the Second Circuit has "consistently held that discussions between supervisors and subordinates about retirement are common in the workplace and do not, by themselves, provide an inference of discriminatory intent." Tillman v. Grenadier Realty Corp., 2025 WL 2910611, at *3 (2d Cir. Oct. 14, 2025) (summary order). The record does not reflect any additional discussions between Kaplan and plaintiff regarding retirement. To the contrary, when plaintiff first requested a severance package in October 2021, Kaplan told plaintiff he was "not in a position to discuss" and referred her to Human Resources. (McCloskey Ex. 22).

Second, the Court cannot discern a discriminatory intent from the separation letter because the parties do not dispute that the separation letter was a standardized template sent to all employees who, based on their age and years of service, qualified for retirement benefits. (McCloskey Decl. Ex. 31).

Third, the record suggests Maria Kalamidas worked under plaintiff and was thus in a position to take over at least some of plaintiff's responsibilities no matter the context of plaintiff's departure. Further, Kalamidas did not assume plaintiff's role—she did not become President of Atlantic Bank—rather, she merely assumed some of plaintiff's public-facing responsibilities, such as appearing in Atlantic Bank-related advertisements. Neither party

explains who, if anyone, assumed the remainder of plaintiff's responsibilities, their age, or their sex. See Dietrich v. City of New York, 2019 WL 2236585 at *5 ("A plaintiff can demonstrate circumstances giving rise to an inference of age discrimination in a variety of ways" including "evidence that similarly situated younger employees are treated more favorably than older ones, or statistical evidence demonstrating a pattern of adverse employment actions against other employees"). Even if Kalamidas did assume plaintiff's role and title, it is not enough to show defendant treated similarly situated younger employees more favorably.

Finally, while the Court agrees that a failure to conduct an adequate investigation into claims of discrimination may constitute evidence of discriminatory intent, that is not the case here. See Sassaman v. Gamache, 566 F.3d 307, 315 (2d Cir. 2009). Following plaintiff's January 14, 2022, complaint, Kaplan and Allen met with plaintiff on February 24, 2022, to discuss plaintiff's concerns. Allen's email of March 1, 2022, and Kaplan's email of March 7, 2022, attempted to at least partially alleviate those concerns by confirming plaintiff would retain her job description and would move to her preferred office location. For the next six months, plaintiff did not complain. This sequence of events is inconsistent with a failure to investigate motivated by discriminatory animus.

Looking at the totality of circumstances, no reasonable jury could conclude that plaintiff's end of employment was motivated, even in part, by discriminatory animus on the basis of sex or age.

Accordingly, defendant is entitled to summary judgment on plaintiff's sex and age discrimination claims under Title VII, the ADEA, and the NYCHRL.

III. Retaliation Claims

Plaintiff argues she was retaliated against for submitting complaints of discrimination in violation of Title VII, the ADEA, and the NYCHRL. Defendant argues plaintiff cannot establish a causal connection between any protected activity and any adverse action under Title VII and the ADEA and that no reasonable jury could conclude defendant's actions were based at least in part on discrimination under the NYCHRL.

The Court disagrees with defendant.

A. Legal Standard

1. Title VII and the ADEA

Retaliation claims brought pursuant to Title VII and the ADEA are reviewed under the McDonnell Douglas, 411 U.S. 792 (1973), burden-shifting framework described above. See Kessler v. Westchester Cnty. Dep't of Soc. Servs., 461 F.3d 199, 205–06 (2d Cir. 2006). To make out a prima facie case of retaliation under Title VII or the ADEA, plaintiff must present evidence sufficient to permit a rational trier of fact to find: (i) she "engaged in protected participation or opposition"; (ii) the employer was aware of this activity; (iii) the employer "took adverse action against the plaintiff"; and (iv) a "causal connection exists between the protected activity and the adverse action." Kessler v. Westchester Cnty. Dep't of Soc. Servs., 461 F.3d at 205–06.

2. NYCHRL

Unlike under Title VII and the ADEA, a plaintiff can prove retaliation under the NYCHRL by demonstrating that "she took an action opposing her employer's discrimination, and that, as a result, the employer engaged in conduct that was reasonably likely to deter a person from engaging in such action." Mihalik v. Credit Agricole Cheuvreux N. Am., Inc., 715

F.3d at 112. As in the discrimination context, the standard is less demanding than the Title VII and ADEA standard, and opposing an employer's practice may include "situations where a person, before the retaliatory conduct occurred, merely made clear her disapproval of the defendant's discrimination by communicating to him, in substance, that she thought his treatment of the victim was wrong." Id. Plaintiff must still establish a causal connection between the protected activity and the employer's action and must show that a defendant's legitimate reason for her termination was pretextual or motivated at least in part by an impermissible motive. See Livingston v. City of New York, 563 F. Supp. 3d 201, 246 (S.D.N.Y. 202).

B. Prima Facie Case

Plaintiff claims defendant retaliated against her for reporting to Cangemi on January 14, 2022, and September 22, 2022, instances of sex and age discrimination.

1. January 14, 2022, Complaint

The parties do not dispute that plaintiff's January 14, 2022, email to Cangemi constituted protected activity under Title VII and the ADEA and defendant was aware of that complaint, thus satisfying the first two elements of a prima facie case for retaliation. However, defendant asserts there was no adverse action and, even if there was, there was no causal connection between the protected activity and the adverse action. Even under the NYCHRL's more lenient standard, defendant says, plaintiff's claim must fail.

The Court agrees.

For purposes of proving retaliation, an adverse employment action is any action that "could well dissuade a reasonable worker from making or supporting a charge of discrimination," including termination. Vega v. Hempstead Union Free Sch. Dist., 801 F.3d 72, 90 (2d Cir. 2015) (quoting Burlington N. & Santa Fe Ry. Co. v. White, 548 U.S. 53, 57 (2006)).

For the same reasons articulated above relating to an adverse employment action supporting plaintiff's discrimination claims, a reasonable jury could conclude plaintiff was terminated and thus summary judgment on the basis that plaintiff did not suffer an adverse employment action is improper.

As for causation, "temporal proximity cannot support an inference of causal connection unless the alleged retaliatory action and the protected activity were 'very close 'in time." Perry v. NYSARC, Inc., 424 F. App'x 23, 26 (2d Cir. 2011) (summary order) (quoting Clark Cnty. Sch. Dist. v. Breeden, 532 U.S. 268, 273–74 (2001)); Gorzynski v. JetBlue Airways Corp., 596 F.3d 93, 110 (2d Cir. 2010) ("Though this Court has not drawn a bright line . . . we have previously held that five months is not too long to find the causal relationship"). Here, defendant argues there is no temporal proximity because plaintiff's employment terminated more than eight months after the January 14, 2022, complaint. See Jimenez v. City of N.Y., 605 F. Supp. 2d 485, 528 (S.D.N.Y. 2009) ("In general, when more than three months have passed between a protected activity and an allegedly retaliatory response, the Second Circuit has deemed the evidence insufficient to raise an issue of fact concerning causation."). Further, as defendant points out, NYCB's efforts to accommodate plaintiff's requests in the intervening period, including the February 24 meeting between plaintiff, Kaplan, and Allen, and Kaplan's March 7 email to plaintiff, are inconsistent with an intent to retaliate.

Based on the extended time period and defendant's intervening actions, the Court agrees plaintiff has not established a causal connection between plaintiff's January 14, 2022, complaint and the adverse employment action, even under the NYCHRL's more lenient standard.

2. September 22, 2022, Emails

Defendant argues plaintiff cannot establish a claim for retaliation based on the September 22, 2022, emails because those emails do not constitute protected activity. Defendant asserts the September 22 emails "were not complaints of discrimination, they were an ultimatum" and "a demand for a multi-million-dollar separation package is not protected activity under Title VII or the ADEA." (Def. Reply at 10–11).

The Court disagrees.

To qualify as protected activity, an employee's actions must be taken "to protest or oppose statutorily prohibited discrimination." Wright v. Monroe City. Hospital., 493 F. App'x 233, 236 (2d Cir. 2012). "Such activity can be either formal, such as the filing of formal discrimination charges, or informal, such as making complaints to management." Champion v. N.Y. State Off. of Parks, Recreation & Historic Preservation., 500 F. Supp. 3d 26, 48 (S.D.N.Y. 2020).

Plaintiff's September 22, 2022, emails constitute complaints to management. The 9:04 a.m. email is characterized explicitly as a "follow up" to the January 14, 2022, complaint, in which plaintiff says she informed Cangemi of the "terrible and discriminatory treatment" she received from NYCB. (McCloskey Decl. Ex. 28). Plaintiff reiterates, as she did in the January 14 complaint, that her exclusion from meetings and lack of clarity about her future role had made it "exceptionally difficult if not impossible to continue to lead Atlantic Bank" and concludes that she can "no longer tolerate" the way she has been mistreated. (Id.).

The Court finds plaintiff has made a prima facie showing that she engaged in protected activity under Title VII and the ADEA. In addition, without a doubt, plaintiff's emails constitute

"disapproval of the defendant's discrimination" sufficient to support a NYCHRL claim. Mihalik v. Credit Agricole Cheuvreux N. Am., Inc., 715 F.3d at 112.

There is also no question defendant was aware of this complaint and, as stated above, that a reasonable juror could conclude plaintiff suffered an adverse employment action via termination.

Finally, as for causation, the four days between the emails and the termination call on September 26, 2022, are sufficiently close in time to permit an inference of retaliation under Title VII, the ADEA, and the NYCHRL. See Champion v. N.Y. State Off. of Parks, Recreation & Historic Preservation., 500 F. Supp. 3d at 50 ("Temporal proximity is sufficient for prima facie causation); Zann Kawn v. Andalex Grp. LLC, 737 F.3d 834, 845 (2d Cir. 2013) (finding three-week period between plaintiff's complaint and termination sufficiently short to make a prima facie showing of causation).

Plaintiff has established a prima facie case for retaliation. In light of defendant's insistence that plaintiff was not terminated, defendant's submissions do not articulate a non-retaliatory reason for plaintiff's termination, obviating the need for a pretext analysis.

Accordingly, because plaintiff's version of events, if credited, could lead a reasonable jury to a finding of retaliation, defendant is not entitled to summary judgment on plaintiff's retaliation claims.

## CONCLUSION

The motion for summary judgment is GRANTED as to plaintiff's discrimination claims (Counts I, II, III, and IV).

The motion for summary judgment is DENIED as to plaintiff's retaliation claims (Counts V, VI, and VII).

The Court will conduct a case management conference on **December 15, 2026, at 10:00 a.m.**, to be held in person at the White Plains courthouse, Courtroom 620, at which time counsel shall be prepared to discuss, among other things, the setting of a trial date and a schedule for pretrial submissions, as well as what good faith efforts they have made and will continue to make to settle this case. To be clear, counsel are directed to discuss settlement in good faith prior to that date.

The Clerk is instructed to terminate the motion. (Doc. #30).

Dated: November 13, 2026
White Plains, NY

SO ORDERED:



Vincent L. Briccetti
United States District Judge